Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1988 WL 13174 (D.D.C.)
(Cite as: 1988 WL 13174 (D.D.C.))
**H**

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
UNITED STATES of America
v.
Charlene BARTON, Kye Briesath, Dorothy Burt, Kay Dellinger, Martin Hird, Lauralee Humphrey, Cynthia Johnson, Shabtai Klein, James McGuiness.
UNITED STATES of America
v.
Lynn FREDRIKSSON, Jeffrey Natt, Richard Galloway.
Crim. Nos. 87-0259-OG, 87-0288-OG.

Feb. 11, 1988.

Thimi Mina, Assistant United States Attorney, for United States.

Nina Kraut, Washington, D.C., for Jeffrey Natt & Lynn Fredriksson.

Lynne Bernabei & Deborah Katz, Washington, D.C., for Martin Hird & Cynthia Johnson.

Daniel Ellenbogen, for Shabtai Klein.

Kay Dellinger, Richard Galloway, Charlene Barton, Dorothy Burt, Lauralee Humphrey, Kye Briesath, James McGuiness, pro se.

*MEMORANDUM*

GASCH, Senior District Judge.

*1 Defendants appeared before this Court during one and one-half days of trial for alleged violation of a National Park Service regulation that prohibits demonstrations by more than twenty-five people on the White House sidewalk without a permit. On June 9, 1987, defendants [FN1] were among approximately 100 people who allegedly continued to occupy the White House sidewalk and express their views after Park Police revoked the demonstration permit for violation of various National Park Service regulations. Following the testimony of the commanding and arresting Park Police officers, several defendants, and two experts on international law and American strategic nuclear arms policy, the Court entertained extensive closing argument by all defendants. [FN2]

After carefully considering the various defenses vigorously argued at trial, the nature of the regulation allegedly violated, and the circumstances surrounding that alleged violation, the Court finds each defendant guilty of demonstrating on the White House sidewalk without a permit. The bases for this determination are set forth below.

*FACTUAL BACKGROUND*

Sometime before June 9, 1987, the American Peace Test ("APT")--a group dedicated to nuclear disarmament--obtained a permit from the National Park Service to hold a rally and demonstration in Lafayette Park and along the White House sidewalk. [FN3] Government Exhibit ("Gov't Ex.") 1; Transcript ("Tr.") 19-20. Such a permit is required for any demonstration or special event involving more than twenty-five people. 36 C.F.R. § 7.96(g)(2)(i) (1987). On June 9, 1987, the APT rally was held, and by one o'clock in the afternoon approximately 400 people had gathered in Lafayette Park to listen to speeches. This activity continued until fifteen minutes past two o'clock when the group, including all the defendants in the cases at trial, moved across Pennsylvania Avenue to the White House sidewalk. Tr. 24-25. For ten minutes thereafter, the demonstration proceeded without transgressing National Park Service regulations.

At twenty-five minutes past two o'clock, however, some unidentified demonstrators brought a model of a missile onto the White House sidewalk. Gov't Exs. 3b & 14b (photographs depicting missile on White House sidewalk); Tr. 25-26, 30. At the same time, some demonstrators affixed themselves or signs and placards to the White House fence while others carrying signs remained stationary in the center zone of the sidewalk. Gov't Ex. 3a; Tr. 29. These activities are prohibited by regulation. See 36 C.F.R. § 7.96(g)(5)(vii)(A) (structures not permitted on White House sidewalk), 7.96(g)(5)(viii) (signs and placards may not be attached to White House fence, nor may signs remain stationary in center zone), 7.96(g)(5)(ix) (no "parcel, container, package, bundle or other property" may be placed on White House sidewalk). Pursuant to their authority under these regulations,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 1

Not Reported in F.Supp.  
(Cite as: 1988 WL 13174, *1 (D.D.C.))

Page 2

the Park Police announced at least three times that the APT permit was revoked and that the White House sidewalk was to be vacated. [FN4] Gov't Ex. 2 (tape recording of announcements); Tr. 26, 57, 65-66, 86, 95 (testimony of various Park Police officers); see 36 C.F.R. § 7.96(g)(6) ("permit may be revoked ... for any violation of applicable law or regulation"). The commanding officer also directed several other officers to move through the crowd and repeat the announcement. Several officers testified that they complied with this directive. Tr. 28, 57, 95, 108.

While the first announcement merely provoked applause from the group, approximately 100 demonstrators, including the defendants, remained after all the announcements had been made. Tr. 27. All these remaining demonstrators were arrested. Tr. 28.

### DISCUSSION

*2 While the legal basis for the charges against the defendants and the Court's finding of guilt is clear, certain statements by defendants and their counsel reveal a degree of confusion that can be eliminated by a more extensive discussion than is necessary merely to explicate the Court's reasoning. Accordingly, the Court will first review the regulations upon which defendants' conviction is based. The discussion will then consider the several defenses urged upon the Court.

*Defendants Have Violated 36 C.F.R. § (g)(2)*

Section 7.96 of the National Park Service regulations establishes a variety of limitations on the use of national parks in the Washington metropolitan area. The obvious purposes of these regulations include preservation of park resources, ensuring that access to the parks is not impeded by the activities of one group, and providing for the security of government officials. *See Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 290 n. 1, 296 (1984); *Juluke v. Hodel,* 811 F.2d 1553, 1159-60 (D.C.Cir.1987); *White House Vigil v. Clark,* 746 F.2d 1518, 1520-21 & n. 4 (D.C.Cir.1984); 48 Fed.Reg. 28058, 28061 (June 17, 1983) (final rule adopting regulations now codified at 36 C.F.R. § 7.96). Consistent with these purposes, demonstrations and special events involving more than twenty-five persons are precluded from the White House sidewalk and Lafayette Park except by permit:

*Permit requirements.* Demonstrations and special events may be held only pursuant to a permit issued in accordance with the provisions of this section except:

(i) Demonstrations involving 25 persons or fewer may be held without a permit *provided* that the other conditions required for the issuance of a permit are met and *provided further* that the group is not merely an extension of another group already availing itself of the 25-person maximum under this provision....

36 C.F.R. § 7.96(g)(2) (1987) (emphasis original). Section 7.96 also restricts the activities that may comprise a special event or demonstration on the White House sidewalk. Specifically, no structures are permitted on the White House sidewalk, no sign or placard may be attached to the White House fence, and no sign or placard may remain stationary in the center portion of the White House sidewalk. *Id.* § 7.96(g)(5)(vii)(A), (viii).

If a demonstration to which a permit has been issued violates any of these restrictions, the Park Police may revoke the permit. *Id.* § 7.96(g)(6). Subsequent to revocation, any demonstration by more than 25 people is a violation of section 7.96(g)(2) of the regulations. While the cases at bar present precisely this situation, some defendants and counsel appear to believe that their arrest was predicated upon the limitations regarding structures, signs, and placards. Tr. 46-47, 87, 89, 97, 102. To the contrary, defendants association with the missile or signs and placards is irrelevant. Their unlawful act was participating with a group of more than twenty-five people in a demonstration for which a valid permit no longer existed. [FN5]

Confusion on the part of some defendants is also evidenced by their argument that they were not part of the APT group and, therefore, not subject to Park Police actions taken with respect to that group or its permit. The argument is flawed for several reasons. First, the permit requirement of section 7.96(g)(2) is not restricted to groups of more than twenty-five people that denominate themselves as a group; a gathering of twenty-six strangers would require a permit. Second, defendants characterization of the permit requirement would

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
(Cite as: 1988 WL 13174, *2 (D.D.C.))

Page 3

necessitate that Park Police determine the affiliation of each participant in a demonstration, count the number of people associated with each identified group, and arrest only those whose group exceed twenty-five people. To impose such a burden on the Park Police would be patently unreasonable and would render the White House sidewalk regulations a nullity. Finally, section 7.96(g)(2)(i) itself states that a group of twenty-five or fewer, which includes one person, is subject to the permit requirement if the group is merely an extension of another, larger group. If defendants were not card-carrying members of APT, they certainly became an extension of that group by <u>knowingly joining</u> the APT group as it crossed Pennsylvania Avenue and participating in the protest activities of the group. [FN6]

*3 Another argument bearing on the White House sidewalk regulations is proffered by defendant Dellinger who insists that the regulations unconstitutionally impair her freedom of speech. The constitutionality of the parcel, sign, and placard restrictions is settled. *Juluke,* 811 F.2d at 1159-61; *White House Vigil,* 746 F.2d at 1532-1540. While the residual question of the constitutional vitality of the section 7.96(g)(2) permit requirement has never been expressly considered, defendant Dellinger's apparent prima facie challenge is easily rejected.

While the White House sidewalk is among the category of public fora that are "vital to a healthy and robust public discourse," *id.* at 1526, first amendment activities on the sidewalk may be limited by reasonable time, place, and manner restrictions. *Id.* 1526-27; see *United States v. Grace,* 461 U.S. 171, 177 (1983). A permit requirement may be among this class of restriction and such requirements do not as a matter of law offend first amendment principles. See *Hynes v. Mayor of Oradell,* 425 U.S. 610, 617 (1976) (narrowly drawn ordinance that does not vest too much discretion in permit-granting official may be valid). The critical question is whether the regulatory provisions requiring a permit vests a government official with unconstitutionally broad discretion to grant or deny the permit. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150-51 (1969). Though defendant Dellinger makes no allegation that the regulations allow the Regional Director too much discretion, the Court notes that section 7.96(g)(4) narrowly defines the circumstances under which a permit may be rejected. [FN7] Consequently, the permit requirement is not unconstitutional on its face.

*International Law, Necessity, and Mistake Are Inapposite to this Case*

*International Law*

*4 In their pretrial briefs and through testimony and argument at trial, defendants vehemently argued to the Court that their actions in violation of section 7.96(g)(2) were excused by defenses available to them under international law. In the words of counsel for two defendants, "if individuals have a reasonable belief that their actions are privileged and justified by international law and their actions in fact are reasonable to prevent ongoing violations of international law," the defendants' actions in violation of domestic law are "complete[ly] and absolute[ly]" excused. Tr. 130. Defendants offered only the testimony of Professor Boyle to substantiate this proposition. See Tr. 190-91 ("there is also teaching [from Nuremberg] that to the extent that individuals in a society have knowledge that crimes [against peace] are being committed or are about to be committed, they have a privilege, certainly, to take necessary reasonable steps to try to prevent these violations").

Apparently, defendants would have this Court find that it is reasonable to disregard intentionally the directives of Park Police and National Park Service regulations designed to ensure the security of the White House and guarantee all visitors to the White House an opportunity to enjoy the visit. Further, defendants also contend that their refusal to leave the White House sidewalk on June 9, 1987 was necessary to prevent some violation of international law. The supposed violation, of course, is the construction and deployment of nuclear weapons by the United States. See Tr. 167-97 (testimony of Professor Boyle).

Defendants derive this international law defense from *Paquete Habana,* 175 U.S. 677 (1900) a case in which the United States seized two Spanish fishing vessels as prizes of war. The Court held that the seizure was unlawful under customary principles of international law because there was no evidence that the ships were engaged in or assisting military activities. *Id.* at 708, 713-14. In reaching this conclusion, the Court noted that "international

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1988 WL 13174, *4 (D.D.C.))

Page 4

law is part of our law" and that in the absence of treaties or other documents "resort must be had to the customs and usages of civilized nations." *Id.* at 700. From these principles, defendants reason that they may demonstrate on the White House sidewalk in groups of more than twenty-five without a permit in order to prevent the United States' continued use of nuclear, military technology.

The Court finds it unnecessary to entertain the purely legal question whether violations of domestic law are excused to prevent violations of international law. Accepting defendants formulation of the defense, however, the Court finds that violation of section 7.96(g)(2) was neither reasonable nor necessary to prevent the Reagan Administration's alleged violation of international law. Because the permit requirement is a reasonable time, place, or manner restriction of free speech, any failure to comply is presumptively unreasonable. Defying the requirement was not reasonable in this case, because defendants' ability to convey their message to the President and the public was in no way impaired by the requirement. Had National Park Service regulations not been violated, defendants would have been allowed to continue their demonstration on June 9. Further, defendants were unquestionably capable of obtaining a subsequent permit or demonstrating in groups of twenty-five or fewer. Violation of section 7.96(g)(2) under these circumstances was not reasonable. [FN8]

*Necessity*

*5 The common law defense of necessity "cover[s] the situation where forces beyond the actor's control render[] illegal conduct the lesser of two evils." *United States v. Bailey,* 444 U.S. 394, 410 (1980). Necessity is established by a showing that the defendants acted to prevent an imminent harm, that no reasonable, lawful alternative could prevent that harm, and that the defendants reasonably perceived a direct causal relationship between their action and the prevention of the harm. *United States v. Dorrell,* 758 F.2d 427, 430-31 (9th Cir.1985). Thus, the defense is unavailable "if there was a reasonable, legal alternative to violating the law." *Bailey,* 444 U.S. at 410 (citing W. LaFave & A. Scott, *Handbook on Criminal Law* 379 (1972)). As the Court has already fully explained, defendants had numerous reasonable, lawful means to express their views; demonstrating without a permit was not compelled by the circumstances. Further, defendants' impatience with the pace of nuclear disarmament negotiations or frustration with unsuccessful efforts to alter the United States' nuclear policy creates no necessity recognized by the law. [FN9] *See Dorrell,* 758 F.2d at 431.

*Mistake of Law*

Finally, defendants urge that their mistake as to the primacy of international law, excuses their violation of section 7.96(g)(2). Generally, ignorance of the law does not excuse criminal conduct. *United States v. Holland,* 810 F.2d 1215, 1222 (D.C.Cir.1987). This principle applies equally well to violation of a regulation as to violation of a statute. *United States v. International Minerals Corp.,* 402 U.S. 558, 563 (1971). While certain narrow exceptions have evolved, *see e.g., Holland,* 810 F.2d at 1222 (statute criminalizes "wholly passive" conduct by person who is unaware of his wrongdoing (citing *Lambert v. California,* 355 U.S. 225, 228 (1957)); *United States v. Barker,* 546 F.2d 940, 947-48 (D.C.Cir.1976) (defendant relied on statements of government official), defendants offer no basis upon which to categorize their conduct as an exception. [FN10]

*CONCLUSION*

Following violations of several National Park Service regulations by members of a group of approximately 400 people demonstrating on the White House sidewalk, Park Police revoked the group's permit and ordered that the sidewalk be vacated. Defendants refused to leave and were arrested. The defendants do not contest the fact of the violation. They argue, however, that their action was excused by reason of necessity or mistake of law and that international law, which they argue is superior to domestic law, required them to remain on the sidewalk. In addition, one defendant challenges the constitutionality of the regulations.

The Court finds no basis in law for the proposition that international law preempts reasonable time, place, and manner restrictions on public speech. Further, defendants failed to establish at least two of the essential elements of the necessity defense and declined to explain adequately how their mistake regarding the primacy of international law excused their violation of the Park Service regulation. Finally, the constitutionality of the regulations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
(Cite as: 1988 WL 13174, *5 (D.D.C.))

Page 5

involved in this case has been settled by the Court of Appeals for this circuit.

Accordingly, the Court finds the defendants in these cases guilty of demonstrating on the White House sidewalk without a permit and in violation of 36 C.F.R. § 7.96(g)(2).

> FN1. Prior to trial, defendant Klein in Cr. No. 87-0259 agreed to post and forfeit collateral. He formally did so early in the trial of these cases, Tr. 14-15, and the government dismissed its case against him. Tr. 43.
>
> FN2. Trial of these cases was without a jury in accordance with the Court's rejection of defendants' motion for jury trial. *See United States v. Barton, et al.*, Cr. Nos. 87-259, 87-288, Mem. Order (Oct. 7, 1987).
>
> FN3. Lafayette Park is the area, "including sidewalks ... within these bounds: on the south, Pennsylvania Avenue NW.; on the north, H Street NW; on the east, Madison Place NW.; and on the west Jackson Place NW." 36 C.F.R. § 7.96(g)(1)(vi) (1987). The White House sidewalk is "the south sidewalk of Pennsylvania Avenue NW., between East and West Executive Avenues NW." *Id.* § 7.96(g)(1)(v).
>
> FN4. The three announcements were made through the public address speakers on three police cruisers parked along the curb of the White House sidewalk. Tr. 26; *see* Tr. 57, 95, 108 (announcements made on public address system).
>
> FN5. It is worth noting, however, that evidence was offered by the government indicating that defendant Dellinger had violated provisions of section 7.96(g)(5). Gov't Ex. 12c; Tr. 95 (defendant Dellinger attaching sign to White House fence).
>
> FN6. Defendant Natt testified that he came to Washington for the purpose of participating in the APT rally. Tr. 149-50, 153-54. Similarly, defendant Fredriksson stated that she "joined" the APT rally and demonstration. Tr. 158.
>
> FN7. Section 7.96(g)(4) empowers the Regional Director of the National Park Service for the Washington metropolitan area to review permit applications. The Regional Director may deny an application if: (1) an application for an incompatible activity has been filed and has been or will be granted; (2) the proposed special event or demonstration "will present a clear and present danger to the public safety, good order, or health"; (3) the proposed activity cannot be accommodated in the national park area designated in the application; or (4) the application proposes activities contrary to law or the regulations.
>
> FN8. The Court also notes that violation of the permit requirement was not necessary to prevent the alleged violation of international law. Such necessity might be demonstrated if the alleged transgression of international law were discrete and imminent. Since this country has pursued a policy of nuclear armament for forty years, any relatively brief delay imposed by the permit requirement could not reasonably be viewed as impairing the efficacy of defendants proposed activities.
>
> FN9. The Court also notes, as did the Ninth Circuit in *Dorrell*, 758 F.2d at 433, that defendants failed to establish that their demonstrating without a permit could reasonably be expected to cause the extinction of nuclear arms. Whatever persuasive value defendants' message might have, it certainly would not have brought about the immediate, or even reasonably foreseeable, disassembly of the United States' nuclear arsenal or reformulation of nuclear strategy.
>
> FN10. Defendants were invited repeatedly to submit briefs on all their defenses. Tr. 131-32, 138, 142. While a brief was received between the first and second days of trial concerning the international law defense, the defendants have declined to tender any further submissions.

Not Reported in F.Supp., 1988 WL 13174 (D.D.C.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

KeyCite                                                                                           Page 6

Date of Printing: NOV 10,2005

## KEYCITE

**U.S. v. Barton**, 1988 WL 13174 (D.D.C., Feb 11, 1988) (NO. CRIM. 87-0259-OG, CRIM. 87-0288-OG)

History

Direct History

=>  1  U.S. v. Barton, 1988 WL 13174  (D.D.C. Feb 11, 1988) (NO. CRIM. 87-0259-OG, CRIM. 87-0288-OG)
    *Judgment Affirmed by*
    2  U.S. v. Fredriksson, 893 F.2d 1404, 282 U.S.App.D.C. 255  (D.C.Cir. Jan 23, 1990)
       (TABLE, TEXT IN WESTLAW, NO. 88-3052)

Related References (U.S.A.)
    3  U.S. v. Natt, 1987 WL 19004  (D.D.C. Oct 07, 1987) (NO. CRIM. 87-259, CRIM. 87-288)

Citing References

No references were found within the scope of KeyCite's citing case coverage.

© Copyright 2005 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.